IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 26, 2005

## STATE OF TENNESSEE v. LARRY WALCOTT

**Appeal from the Circuit Court for Rhea County**
**No. 15711      J. Curtis Smith, Judge**

---

**No. E2004-02705-CCA-R3-CD - Filed August 22, 2005**

---

The Defendant, Larry Walcott, was convicted by a jury of aggravated assault. The trial court sentenced the Defendant as a Range I, standard offender to five and one-half years in the Tennessee Department of Correction. In this appeal as of right, the Defendant raises four issues: 1) whether the trial court erred in refusing to recuse itself; 2) whether the trial court erred in refusing to sequester the jury; 3) whether the evidence is sufficient to support his conviction; and 4) whether the trial court erred in ordering the Defendant to serve his sentence in confinement. Finding no reversible error in the issues raised by the Defendant, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and J.C. MCLIN, J., joined.

Howard L. Upchurch, Pikeville, Tennessee, for the appellant, Larry Walcott.

Paul G. Summers, Attorney General and Reporter; David E. Coenen, Assistant Attorney General; J. Michael Taylor, District Attorney General; and James W. Pope, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

Melissa Sullivan testified that she was visiting her sister's house on Sunday, May 20, 2001, after having spent the night there. Also present on Sunday were her brother-in-law Eric Smith, Ricky Mundy, her brother Jeremy Westlake, and numerous children. She had met the victim, Allen McClendon, while she was there the day before. Ms. Sullivan stated that the victim had been drunk on Saturday and had wandered off into the woods on Saturday evening. She saw him return to the

house on Sunday morning about ten o'clock. He had a beer in his hand and laid down on the couch on the front porch, which was next to the front door. Ms. Sullivan testified that the victim "passed out," lying on his back.

Around lunch time, Ms. Sullivan saw the Defendant arrive in a van being driven by another man. She had not previously met the Defendant. The Defendant walked onto the front porch and to the front door. As he was entering the house, Ms. Sullivan heard him say something like, "Do you want me to take this trash off the porch?" The victim remained asleep during the Defendant's arrival. Ms. Sullivan explained that the Defendant remained in the house about ten minutes. When he came back out onto the front porch, he grabbed the victim and began hitting him with his fist. Ms. Sullivan testified that the Defendant struck the victim in the face "very hard" with his right fist seven or eight times. The victim did not respond because he was unconscious. She and Mr. Mundy tried to stop the Defendant. When the Defendant stopped, he told her something like, "I don't know who you are and I'm sorry if your kids seen that." She stated, however, that the Defendant said this in a sarcastic tone. The Defendant then left.

Ms. Sullivan said that there was a "lot" of blood, and that it was "all over."

Eric Smith, who lived with his wife and Ricky Mundy in the house where the beating took place, testified that both the victim and the Defendant were friends of his. He also stated that, on the day in question, the victim was drunk and "passed out" on the couch on the front porch when the Defendant arrived. At that time, Mr. Smith was in his bedroom watching television. The Defendant came in and asked for the whereabouts of a mutual acquaintance. The Defendant stayed a few minutes and said nothing about the victim. The Defendant then left while Mr. Smith remained in his bedroom. Mr. Smith did not notice anything until several children came in screaming. He looked out his window and saw the Defendant leaving in the van.

Mr. Smith went outside onto the front porch and described what he saw as follows:

> [The victim] was lay[ing] there on the ground, a big hunk of lip hanging down and eye was pooched out and hanging down on his cheek, blood everywhere. He was gurgling on this blood and we had to roll him over on his side and dig some stuff out of his mouth where he could breathe. It was pretty gross.

Mr. Smith stated that the victim was unconscious. Mr. Smith called 911 and administered aid to the victim until the ambulance arrived.

Mr. Smith testified that he had known the victim for four or five years and that, prior to the beating, he had been an able-bodied man who worked in construction. Since the beating, Mr. Smith said, the victim was "ruined."

Jeremy Westlake testified that he was in the house when the Defendant arrived. According to Mr. Westlake, the victim was on the couch on the front porch "passed out." Mr. Westlake

remained in the house when the Defendant left. Mr. Westlake heard "a couple of knocks" and then some of the children started crying. Mr. Westlake went out onto the front porch and saw the Defendant hit the victim once in the face. Mr. Westlake testified that he then saw the Defendant kick the victim twice in the head. The Defendant stopped beating the victim when he noticed the children. According to Mr. Westlake, the Defendant then said to Ms. Sullivan, "I'm sorry for doing this in front of your f---ing kids." The Defendant was "smirking" as he said this.

Mr. Westlake stated that the victim's eye was "hanging out of his head and blood was pouring out of his mouth." The victim was not moving. He and Ms. Sullivan took the victim off the couch and put him on his side next to it because he was "gargling" on his blood.

Allen McClendon, the victim, testified that he was forty-five years old, five feet, six inches tall, and weighed 150 pounds. He had been drinking "a lot" prior to passing out on the couch on Mr. Smith's front porch. He did not see the Defendant arrive. Mr. McClendon testified that "[a]ll [he] saw was fists flying in [his] face." He also stated that the Defendant kicked him three times above his left ear after pulling him off the couch. He became unconscious as a result of the beating and woke up in a helicopter on its way to Erlanger Hospital.

Mr. McClendon stated that he now lived in a nursing home because of his injuries. He described some of the lingering effects of the beating as follows:

> My equilibrium is off. I weave and bob and I can't tie my shoes and a lot of other stuff like that. I can't reason like I use to be able to. I use to be quick at reasoning and now I'm slow.

He stated that he "can't even drive a car." He required nine and one-half months of rehabilitation after he was released from the hospital because he could not walk, could not feed himself, and was incontinent.

Dr. David Ciraulo testified that he treated the victim upon his arrival at the trauma unit at Erlanger. The victim had been intubated prior to his arrival so that he could breathe. Dr. Ciraulo stated that the victim suffered a concussion, facial fractures, and an injury to his left eye that required treatment by plastic surgery and opthamology. Specifically, the victim required the installation of metal plates in his face in order to stabilize his facial bones and keep his left eye in place. He also required stitches to the lacerations on his face. The victim required a ventilator for breathing. He remained in the hospital for twelve days.

The Defendant, Larry Walcott, testified on his own behalf. He stated that he was fifty years old, five feet, ten and one-half inches tall, and weighed 218 pounds. He explained that he and the victim had been "good friends," and that they used to work together. However, he became convinced that the victim had stolen a depth-finder from his boat.

The Defendant stated that he went over to the Smith residence on that Sunday to pick up some coloring stencils. When he walked onto the Smith porch, the victim was sitting on the couch with Ms. Sullivan and the two were having a conversation. As he walked near the couch to go into the house, the victim kicked him on his right leg. The Defendant told him, "Don't be here when I come back out here."

The Defendant went into the house. There, he testified, Ricky Mundy told him to "kick [the victim's] ass, Larry. Kick his ass." Mr. Mundy told him that the victim had stolen $11,000 from someone in Soddy, and that he had broken a glass in the Smith kitchen and "the kids was stepping in it." According to the Defendant, Jeremy Westlake joined in, saying, "Yeah, Larry, whoop him, whoop him." The Defendant asked Eric Smith for his opinion, and Mr. Smith allegedly replied, "I don't care." The Defendant testified that he told these men, "I'll tell you all three something. I'm not whooping him because of you guys. I'm whooping him because of what he did to me just a little bit ago, kicked me on my leg."

When the Defendant returned to the porch he saw the victim and Ms. Sullivan still on the couch. He stated that he walked around Ms. Sullivan and hit the victim "up side of his head." At the time, the victim "had a real smirk on his face like he was daring" the Defendant. According to the Defendant, that first punch knocked the victim out. The Defendant continued to hit the victim with his fist for a total of seven or eight times. The Defendant stated that he did not kick the victim. When he heard someone say "he's had enough," he stopped hitting the victim. At this point, the victim had "pretty big knots on the side of his head" and was bleeding from his nose and mouth. The Defendant told Ms. Sullivan he "was sorry about everything that happened in front of her kids like that," and left. He got back in the van being driven by his son-in-law and they left to go to a beer store.

When questioned by the police, the Defendant admitted having beaten up the victim. He was subsequently indicted for aggravated assault. After hearing the above proof, the jury convicted the Defendant as charged.

## ANALYSIS

Before undertaking our analysis of the Defendant's challenges to his conviction and sentence, we are constrained to comment upon the efficacy of the Defendant's appeal. Judgment was entered against the Defendant on July 17, 2003. The Defendant's motion for new trial was timely filed on August 5, 2003. The trial court entered an order denying the Defendant's motion for new trial on November 5, 2003. On November 5, 2004, the trial court entered another order denying the Defendant's motion for new trial, on the basis that the previous order had not addressed all of the issues raised in the motion for new trial. The Defendant filed his notice of appeal on November 5, 2004.

The November 5, 2004 order entered by the trial court is a nullity because the trial court no longer had jurisdiction at that time. The trial court's jurisdiction over the Defendant's case terminated thirty days after the trial court entered its original order denying the Defendant's motion

for new trial.  See State v. Reed, 665 S.W.2d 405, 407 (Tenn. Crim. App. 1983).  The Defendant had thirty days after the trial court entered its original order denying the motion for new trial in which to file his notice of appeal.  See Tenn. R. App. P. 4(a), (c).  However, the Defendant did not file his notice of appeal until November 5, 2004 — eleven months after the deadline had passed.

Nevertheless, our Rules of Appellate Procedure provide that, in criminal cases, "the 'notice of appeal' document is not jurisdictional and the filing of such document may be waived in the interest of justice."  Tenn. R. App. P. 4(a).  This Court has determined that such a waiver is in the interest of justice and we will therefore entertain this appeal.

## I.  Motion to Recuse Trial Court

After the jury was impaneled, but before the State presented any proof, defense counsel orally moved the trial judge to recuse himself on the grounds that an associate of his former law partner was at the trial and sitting with the victim; that during the partnership, the judge's former partner had represented the victim's father and brother; and that the judge still had "some financial interests in assets and properties" with his former law partner.  Defense counsel argued that these circumstances created an appearance of impropriety such that the judge should recuse himself.  The trial judge acknowledged that he had practiced law with his former partner for approximately twenty years before taking the bench; that his partner had represented the victim's father during their partnership; that he continued to have a joint ownership interest with his former partner in a building; and that an associate of his former partner's law firm was there with the victim's father.  The trial judge also stated that he was not personally acquainted with any of the other members of the victim's family, and that he no longer had "any connection" with the law firm.  The trial judge then stated that "[t]hose facts would not affect my judgment in this case," and denied defense counsel's motion.  The Defendant now contends in this direct appeal that the trial judge erred in refusing to recuse himself.

Our Supreme Court's Rules provide, in pertinent part, the following:

A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where:
(a) the judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of disputed evidentiary facts concerning the proceeding;
(b) the judge served as a lawyer in the matter in controversy, or a lawyer with whom the judge previously practiced law served during such association as a lawyer concerning the matter, or the judge has been a material witness concerning it; [or]
(c) the judge knows that he or she, individually or as a fiduciary . . . has an economic interest in the subject matter in controversy or in a party to the proceeding or has any other more than de minimus interest that could be substantially affected by the proceeding . . . .

Tenn. Sup. Ct. R. 10, Canon 3(E)(1) (asterisks omitted).  With respect to these provisions, our Supreme Court instructs us as follows:

Litigants, as the courts have often said, are entitled to the "cold neutrality of an impartial court." Thus, one of the core tenets of our jurisprudence is that litigants have a right to have their cases heard by fair and impartial judges. Indeed, "it goes without saying that a trial before a biased or prejudiced fact finder is a denial of due process." Accordingly, judges must conduct themselves "at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary," and "shall not be swayed by partisan interests, public clamor, or fear of criticism." As we said many years ago, "it is of immense importance, not only that justice be administered . . . but that [the public] shall have no sound reason for supposing that it is not administered." If the public is to maintain confidence in the judiciary, cases must be tried by unprejudiced and unbiased judges.

Given the importance of impartiality, both in fact and appearance, decisions concerning whether recusal is warranted are addressed to the judge's discretion, which will not be reversed on appeal unless a clear abuse appears on the face of the record. A motion to recuse should be granted if the judge has any doubt as to his or her ability to preside impartially in the case. However, because perception is important, recusal is also appropriate "when a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality." Thus, even when a judge believes that he or she can hear a case fairly and impartially, the judge should grant the motion to recuse if "the judge's impartiality might reasonably be questioned." Hence, the test is ultimately an objective one since the appearance of bias is as injurious to the integrity of the judicial system as actual bias.

Davis v. Liberty Mut. Ins. Co., 38 S.W.3d 560, 564-65 (Tenn. 2001) (citations omitted).

The Defendant argues that the trial judge abused his discretion in denying the Defendant's motion to recuse because "[t]he Defendant had the right to expect a judge with absolutely no professional or economic relationship with the victim's family or counsel for the victim's family." However, we see no clear abuse of discretion in the trial judge's ruling. The only "relationship" between the trial court and counsel for the victim's family is a joint ownership interest that the trial judge has with his former law partner in a building. Although the Defendant states in his brief that this building is the one in which the trial judge's former partner practices law, the record does not support this statement. Moreover, such a tenuous connection does not create an impropriety or an appearance of impropriety. The judge stated that he was not personally acquainted with the victim and had no existing connection with his former partner's law firm. There is absolutely no indication in the record that the trial court had a personal bias or prejudice concerning the Defendant, or knowledge of any of the facts involved in the instant case. Neither the judge nor the judge's former partner served as a lawyer concerning this matter during the partnership. The judge has not been a material witness concerning this matter. There is no indication that the trial court's joint interest with his former partner in a building could have been affected by the instant case. In short, the record simply does not support the Defendant's assertion that the trial judge's former partnership and/or his real estate holdings created any real or reasonably perceived threat to the judge's

impartiality with respect to the Defendant's trial. The trial court committed no abuse of discretion in denying the Defendant's motion to recuse and this issue is therefore without merit.

## II. Refusal to Sequester Jury

After the jury had been sworn, but before any witnesses had been called, the trial court called for the morning break. Before the jurors left the courtroom, the trial court addressed them as follows:

> Finally, this courtroom only has this common entrance here, so you know that you'll have to walk in and out the double doors over there. Don't speak with anyone as you come in and out. You may inadvertently speak with someone that's interested in the case and if that's seen from a distance, you may just simply be saying good morning or hello or something like that, but it may have an appearance that something improper is going on. The lawyers know not to speak with you. The witnesses know not to speak with you, so for today you'll just have to not do that thing that we often do in the south, and that is speak to about everybody that we see.

After this reference to the "common entrance" that the jurors might share with other people, defense counsel orally moved the court to sequester the jury. The trial court denied defense counsel's motion. The Defendant now contends that the trial court erred in so doing.

Initially, we note that the Defendant did not include this issue in his motion for new trial. Accordingly, this issue is waived. See Tenn. R. App. P. 3(e). Morever, it is without merit. Effective May 8, 2002, our legislature amended Tennessee Code Annotated section 40-18-116 to provide that, "In all criminal prosecutions, except those in which a death sentence may be rendered, jurors shall only be sequestered at the sound discretion of the trial judge. . . ." Thus, this Court will not find error in a trial court's refusal to grant a sequestered jury absent an abuse of discretion.[1] We see no such abuse here. The motion was made in response to the trial court's informing the jurors that there was a possibility they might find themselves in physical proximity at the courthouse with other persons connected with the trial. The trial court further informed the jurors that, in the event they found themselves amongst other persons in the courthouse, they should not speak to anyone, even at the risk of appearing rude. The Defendant has adduced no evidence that any of the jurors actually did find themselves in such a position, or, that if they did, anything improper occurred as a result. We see no error by the trial court in its instructions to the jury, and no abuse of discretion in denying the Defendant's subsequent motion for a sequestered jury. The Defendant is not entitled to relief on this basis.

## III. Sufficiency of the Evidence

In his third issue, the Defendant contends that the evidence is not sufficient to support his conviction of aggravated assault. Specifically, he argues that the State failed to prove that he caused "serious bodily injury" to the victim during the beating.

---

[1] The Defendant's trial began on November 26, 2002.

Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. See Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. See Evans, 108 S.W.3d at 236-37; Carruthers, 35 S.W.3d at 557.

The Defendant was charged with and convicted of aggravated assault by knowingly assaulting the victim and thereby causing serious bodily injury. See Tenn. Code Ann. § 39-13-102(a)(1)(A). The Defendant does not dispute that he assaulted the victim. Rather, he claims that the State failed to prove that he thereby caused the victim serious bodily injury. Our criminal code defines "serious bodily injury" as bodily injury involving a substantial risk of death, protracted unconsciousness, extreme physical pain, protracted or obvious disfigurement, or the protracted loss or substantial impairment of a function of a bodily member, organ, or mental faculty. See id. § 39-11-106(a)(34). We have no hesitation or difficulty in concluding that the victim suffered serious bodily injury as a result of the beating administered by the Defendant. The victim was rendered unconscious and remained so through his ambulance trip to the Rhea County General Hospital; he did not regain consciousness until sometime during the helicopter flight from that hospital to Erlanger.[2] During that time and afterward, he required assistance to breathe. The Defendant broke bones in the victim's face and caused the victim's left eye to leave its socket. These injuries required the victim to undergo surgery and the installation of metal plates in his face. The victim required stitches to the lacerations on his face caused by the Defendant. The victim required months of rehabilitation after a twelve day hospital stay, and continues to suffer the effects of the beating in

---

[2]The victim testified that the ambulance initially took him to the county hospital but they were unable to treat him there. He was flown from the county hospital to Erlanger.

both his body and his mind. He now lives in a nursing home. The Defendant's claim that the State did not adduce sufficient proof of "serious bodily injury" to support his aggravated assault conviction is totally without merit.

## IV. Sentencing

In his final issue, the Defendant argues that the trial court erred in denying him an alternative sentence and ordering him to serve his sentence in the penitentiary. We disagree and affirm the trial court's sentencing decision.

Before a trial court imposes a sentence upon a convicted criminal defendant, it must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; and (f) any statement the defendant wishes to make in the defendant's own behalf about sentencing. See Tenn. Code Ann. § 40-35-210(b); State v. Imfeld, 70 S.W.3d 698, 704 (Tenn. 2002). To facilitate appellate review, the trial court is required to place on the record its reasons for imposing the specific sentence, including the identification of the mitigating and enhancement factors found, the specific facts supporting each enhancement factor found, and the method by which the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. See State v. Samuels, 44 S.W.3d 489, 492 (Tenn. 2001).

Upon a challenge to the sentence imposed, this court has a duty to conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. See Tenn. Code Ann. § 40-35-401(d). However, this presumption "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then the presumption is applicable, and we may not modify the sentence even if we would have preferred a different result. See State v. Fletcher, 805 S.W. 2d 785, 789 (Tenn. Crim. App. 1991). We will uphold the sentence imposed by the trial court if (1) the sentence complies with the purposes and principles of the 1989 Sentencing Act, and (2) the trial court's findings are adequately supported by the record. See State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001). The burden of showing that a sentence is improper is upon the appealing party. See Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments; Arnett, 49 S.W.3d at 257.

A defendant who does not possess a criminal history showing a clear disregard for society's laws and morals, who has not failed past rehabilitation efforts, and who "is an especially mitigated or standard offender convicted of a Class C, D, or E felony is presumed to be a favorable candidate for alternative sentencing options in the absence of evidence to the contrary." Tenn. Code Ann. § 40-35-102(6); see also State v. Fields, 40 S.W.3d 435, 440 (Tenn. 2001). The following

considerations provide guidance regarding what constitutes "evidence to the contrary," which would rebut the presumption of alternative sentencing:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

Tenn. Code Ann. § 40-35-103(1); see also State v. Hooper, 29 S.W.3d 1, 5 (Tenn. 2000).

Additionally, the principles of sentencing reflect that the sentence should be no greater than that deserved for the offense committed and should be the least severe measure necessary to achieve the purposes for which the sentence is imposed. See Tenn. Code Ann. § 40-35-103(2), (4). The court should also consider the defendant's potential for rehabilitation or treatment in determining the appropriate sentence. See id. § 40-35-103(5).

The presentence report admitted as an exhibit at the Defendant's sentencing hearing reflects that the Defendant's version of the aggravated assault, even after his trial, was that he was "assaulted" and that he "defended [him]self." The report also reflects that the Defendant has a 1999 conviction of driving while impaired, a 1995 conviction of assault, a 1994 conviction of driving while impaired, a 1991 conviction of assault, a 1988 conviction of smuggling cocaine, two 1986 convictions of assault, a 1983 conviction of assault, a 1982 conviction of assault, and a 1974 conviction of public intoxication. The Defendant served in the military from January 1969 until September 1972 and received an honorable discharge.

The Defendant's wife, Dianna Walcott, testified that she and the Defendant had been married thirty-two years as of the time of the hearing. She explained that the Defendant had served in Vietnam for thirteen and one-half months and had since been diagnosed by the Veteran's Administration with post-traumatic stress disorder. She stated that, since the Defendant attacked the victim, the Defendant's physicians had changed his medications "to calm him down, to help him sleep." She advised the court that the Defendant is now taking morphine as well as other mood altering drugs. Ms. Walcott said that her husband was taking "about nine" different medications.

Ms. Walcott testified that she and her husband lived on five acres that was like "an animal farm." With them lived one of their daughters and her four children. Ms. Walcott stated that the Defendant rarely socialized, preferring to stay on the farm, tend to the animals, and limit his socialization to his family. She stated that the Defendant had not had any physical altercations with anyone during the past year. He drinks six to twelve beers a month. He does not drive. He visits the Veteran's Administration hospital once a month and sees a psychiatrist monthly.

On cross-examination, Ms. Walcott acknowledged that the Defendant had assaulted her "maybe three" times. She called the police each time but eventually dropped the charges. She maintained that the Defendant could now control his anger "since they put him on different medications."

A copy of the Defendant's records from the Department of Veterans Affairs was also admitted at the Defendant's sentencing hearing. Those records indicate that, as of December 29, 1993, the Defendant was determined to be thirty percent disabled due to service connected post-traumatic stress disorder. As of January 8, 1997, the Defendant's disability was increased to one hundred percent. The records further indicate that the Defendant was diagnosed as suffering from "anxiety neurosis and personality disorder" which was not service connected but a "constitutional/developmental abnormality."

The written report of a review examination conducted on April 5, 2002, by Dr. Lefton, a psychologist, reveals that the Defendant told Dr. Lefton that he was arrested for the instant offense "for what apparently was a simple assault." According to the report, the Defendant has no other history of "violence or assaultiveness." The Defendant also told Dr. Lefton that he smoked marijuana "every now and then."

Other Veterans Administration records introduced at the hearing indicate that the Defendant used heroin while in Vietnam, that he has smoked marijuana on occasion since Vietnam, that he was evaluated in 1994 and determined to have "a life long history of difficulty in dealing with authoritarian figures and adjusting to rules and regulations of society," and that the Defendant had a "moderate to severe" personality disorder.

Following the sentencing hearing, the trial court sentenced the Defendant as a Range I, standard offender to five and one-half years out of a possible maximum sentence of six years. See Tenn. Code Ann. § 40-35-112(a)(3).[3] The Defendant does not contest the length of his sentence. In determining whether to grant the Defendant an alternative sentence or order him to serve his sentence with the Tennessee Department of Correction, the trial court stated in its comprehensive Memorandum Opinion on Sentencing the following:

> Mr. Walcott's Veteran's Administration records establish that he suffers from post traumatic stress disorder. All the proof this court must consider shows the defendant to be an anti-social and violent individual. The earliest indications of such behavior are reflected in his conflicts with superior officers while in the Army when he was a very young man. The proof also reflects he has taken illegal drugs most all his adult life beginning with cocaine [sic] in Vietnam and continuing with marijuana at present. The Veteran's Administration records note that the defendant has not

_____

[3]A knowing aggravated assault causing serious bodily injury is a Class C felony. Tenn. Code Ann. § 39-13-102(d)(1).

come for treatment very much in the past and probably will not seek required treatment in the future.

Defendant's counsel vigorously argued at the sentencing hearing that his client is finally being properly medicated by the Veteran's Administration, implying that if Mr. Walcott had been properly medicated before, he would not have assaulted Mr. McClendon. There was no proof presented which establishes Mr. Walcott received insufficient or improper medication in the past and that he is now properly medicated. There is proof, however, he has not sought treatment very often in the past. Any finding by this court regarding the sufficiency of defendant's medi[c]ation could only be based on counsel's argument, and thus would only amount to speculation.

Mr. Walcott testified at trial but not at the sentencing hearing. At trial he testified that the reason he assaulted the victim was because Mr. McClendon slapped him on the leg as he walked into the house, but this court finds defendant's testimony not credible in that regard. Essentially, defendant admitted he attacked Mr. McClendon for no good reason, and stated to witnesses at the scene he wanted "to take out the trash." Defendant was untruthful in his testimony at trial, was untruthful with the probation officer who prepared the pre-sentence report when he stated he acted in self-defense and was untruthful with the Veteran's Administration when he stated he was charged in this offense with simple assault. His total lack of candor negatively reflects on his potential for rehabilitation.

This court has considered the proof in the record as to the sentencing consideration[s] set out in T.C.A. § 40-35-103(1). This court finds the following four factors weigh toward incarceration:

(1) Defendant has a long history of criminal conduct.

(2) Defendant stands convicted of a serious offense.

(3) Deterrence may be considered in sentencing when a court finds ". . . the defendant's crime was the result of intentional, knowing, or reckless conduct . . . " and when ". . . the defendant has previously engaged in criminal conduct of the same type as the offense in question . . . ."

Here, this court has found defendant's actions to be intentional. Further, defendant's history reveals numerous instances of assaultive behavior over many years.

(4) Measures less restrictive than confinement had been applied unsuccessfully.

Defendant has been confined for relatively short periods as a result of his assaultive behavior, but he has continued to violate the law.

. . .

Even though the defendant suffers from post traumatic stress disorder, he is not delusional[,] and he is able to intelligently communicate. Defendant was not provoked nor was he under any apparent stress at the time he committed this crime. He is untruthful, unremorseful, has a history of violent behavior, and is likely to

commit similar behavior in the future. He is not a likely candidate for successful rehabilitation. Having considered all the evidence, principles of sentencing and applicable law, this court finds the defendant should serve his five-and-one-half (5½) year sentence in the Tennessee Department of Corrections. It should be noted that a court may deny probation based solely on the circumstances of the offense when those circumstances are especially violent, horrifying, shocking, reprehensible, offensive, or otherwise of an excessive or exaggerated degree. While this court has found other circumstances to apply, had only the circumstances of the event existed, a penitentiary sentence would still have been appropriate.

(citations omitted). We commend the trial court on the thoroughness with which it addressed this issue.

As set forth above, it is the Defendant's burden to demonstrate that the trial court's decision to imprison him is improper. The Defendant has failed to carry this burden. This Court has considered all of the evidence adduced in this case, including the photographs of the victim taken after his initial treatment at Erlanger hospital, and agrees with the trial court that the circumstances of this offense weigh against any grant of an alternative sentence. The Defendant savagely beat the victim in the face while the victim was prone, unconscious, and defenseless. The attack was unprovoked and unnecessary. Even by the Defendant's version of events, the first blow knocked the victim unconscious yet the Defendant continued the beating. The victim has suffered permanent injuries and, by his own testimony, can no longer work. We agree with the trial court that the Defendant's actions in assaulting the victim were especially violent, horrifying, shocking, reprehensible, and offensive so as to support a denial of an alternative sentence. See State v. Blackhurst, 70 S.W.3d 88, 98 (Tenn. Crim. App. 2001); State v. Hartley, 818 S.W.2d 370, 374-75 (Tenn. Crim. App. 1991).

We further agree with the trial court that the Defendant has demonstrated a lack of rehabilitative potential by his lack of candor and his lack of remorse. See State v. Souder, 105 S.W. 3d 602, 608 (Tenn. Crim. App. 2002) (noting that "the lack of candor militates against the grant of probation."); State v. Richerson, 612 S.W.2d 194, 196 (Tenn. Crim. App. 1980) (noting that "the lack of remorse has a direct bearing on a defendant's prospect for rehabilitation."). Like the trial court, we are also concerned about the Defendant's prior history of assaults and his apparent failure to learn from his past mistakes. The Defendant's attitude about the instant crime and his criminal history both support a denial of an alternative sentence. Accordingly, we see no error by the trial court in its sentencing of the Defendant, and this issue is therefore without merit.

## CONCLUSION

The judgment of the trial court is affirmed.

_____
DAVID H. WELLES, JUDGE